**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*

February 26, 2020

**BY ECF**

The Honorable Vernon S. Broderick
United States District Judge
United States Courthouse
40 Foley Square
New York, New York 10007

Re:   ***United States v. Oneil Scott,***
16 Cr. 029 (VSB); 19 Cv. 3322 (VSB)

Dear Judge Broderick:

The Government writes in response to the defendant's timely petition for habeas relief. *See* Dkt. No. 63. The petition makes two arguments: (i) that counsel was ineffective for failing file a notice of appeal from the judgment of conviction; and (ii) that the Court should credit the defendant's time spent in custody between 2016 and 2019 on a prior criminal case. The Government respectfully submits that the second argument should be denied as meritless. As to the first argument, however, because there is a valid argument that defense counsel should have filed an appeal, the Government believes that the best course of action is for the Court to vacate and re-enter its judgment, so that the defendant may file an appeal.

> **I.      Ineffective Assistance of Counsel**

The defendant argues that defense counsel was ineffective for failing to file a notice of appeal. It is undisputed that no appeal was filed in the defendant's case. On or about November 12, 2019, the Government received a declaration from defense counsel, discussing their communications with the defendant about filing a notice of appeal, attached as Exhibit A (the "Original Declaration"). After reviewing the Original Declaration, the Government asked for a supplemental declaration, setting forth further facts. On or about February 20, 2020, the Government received a supplemental declaration from defense counsel, attached as Exhibit B (the "Supplemental Declaration").

After reviewing both declarations, the Government believes that the defendant has a valid argument that he asked defense counsel to file a notice of appeal. The Government therefore believes that the best course of action is for the district court to vacate and then re-enter the judgment, thereby reopening the period for the filing of a direct appeal, so that the defendant may file an appeal. *See Garza v. Idaho*, 139 S. Ct. 738, 749-50 (2019) (holding that where an

attorney failed to file a notice of appeal despite defendant's request, prejudice is presumed without any further showing of the merits of the underlying claims, and regardless of whether the defendant signed an appeal waiver); *see also United States v. Fuller*, 332 F.3d 60, 65 (2d Cir. 2003) (remanding case with meritorious ineffective assistance of counsel claim, so that district court could "vacate the judgment and enter a new judgment from which a timely appeal may be taken").

## II.    Credit for Time Spent In Custody

The defendant's second argument, that the Court should credit the defendant's time spent in custody between 2016 and 2019 on a prior criminal case, has no merit and should be denied. As a preliminary matter, it is not clear that a habeas petition is the appropriate place to make this argument for the first time. But in any event, putting aside any procedural deficiencies, the argument can be denied on the merits.

### a.   Procedural History

In August 2014, the defendant was arrested and charged in the Southern District of New York with participation in a September 2010 gunpoint robbery of a marijuana dealer in the Bronx, New York. This robbery involved different individuals than the instant offense, and occurred three years before the beginning of the conspiracy charged in the instant offense. The defendant was detained during the pendency of the case. On November 24, 2014, the defendant pleaded guilty to conspiracy to commit robbery, in violation of Title 18, United States Code, Section 1951, with a Guidelines range of 63 to 78 months' imprisonment (the "2010 Robbery Conviction"). On April 21, 2015, the Honorable P. Kevin Castel sentenced the defendant to 63 months' imprisonment (the "2010 Robbery Sentence").

In January 2016, while serving the 2010 Robbery Sentence, the defendant was arrested in the instant case on charges relating to a series of robberies that he committed in 2014, as well as his participation in the kidnapping, attempted robbery, and murder of Wayne Thomas on March 11, 2014. The defendant faced a mandatory minimum sentence of life imprisonment plus seven years' imprisonment.

On December 23, 2016, the defendant appeared before this Court and pleaded guilty to Superseding Information S4 16 Cr. 029 (VSB), pursuant to a plea agreement (the "Plea Agreement"). (Presentence Report ("PSR") ¶¶ 5-6). The defendant pleaded guilty to two counts: participating in a robbery conspiracy from 2013 to 2014; and conspiring to kidnap Wayne Thomas in March 2014. In the Plea Agreement, the defendant and the Government stipulated that the defendant was in Criminal History Category II and that an offense level of 43 applied to his conduct, resulting in a stipulated Guidelines sentence of life imprisonment. (*Id.* at ¶ 6). There was no mandatory minimum. The Plea Agreement accorded three criminal history points to the 2010 Robbery Conviction.

In advance of the defendant's sentencing, the Probation Office prepared its Presentence Report ("PSR"). The Probation Office reached the same conclusion that was stipulated in the Plea Agreement: that based on an offense level of 43 and a Criminal History Category of II, the

applicable Guidelines sentence was life imprisonment.  (*Id.* at ¶ 124).  The PSR accorded three criminal history points to the 2010 Robbery Conviction, as the Plea Agreement also had, with no objection from the defendant.

The sentencing took place on February 25, 2019.  The Court began the sentencing by confirming that defense counsel had reviewed the PSR with the defendant.  (Ex. C, Sent. Tr. 5-6).  The Court also confirmed that neither party had any objections to the PSR, and adopted the PSR's Guidelines calculation.  (*Id.* at 6).  The Government then spoke and urged the Court to impose a Guidelines sentence of life imprisonment, noting, among other things, the defendant's long history of violent crimes.  (*Id.* at 11-14).

The Court asked the Government whether, given the 2010 Robbery Sentence, the defendant was getting credit in the instant case for the time that the defendant was currently in jail.  (*Id.* at 18).  The Government stated that that would depend on whether the Court decided to run the sentence in the instant case consecutively or concurrent to the 2010 Robbery Sentence.  (*Id.*).  The Court clarified that the defendant had been sentenced to 63 months' imprisonment in the 2010 Robbery Sentence, and asked when the defendant would complete the 2010 Robbery Sentence.  (*Id.* at 19).  Defense counsel, after conferring with the defendant, stated that the defendant believed that he would finish serving the 2010 Robbery Sentence on May 14, 2019.  (*Id.*).  The Government also reiterated its position that the 2010 Robbery Conviction was not relevant conduct in the instant case, because it concerned different robberies committed by different actors at a different time.  (*Id.* at 29-30).

After clarifying this issue, the Court heard from defense counsel and the defendant, and discussed the sentencing factors at length.  (*Id.* at 31-38).  The Court then imposed a sentence of 300 months' imprisonment, to run consecutively to the 2010 Robbery Sentence.  (*Id.* at 38-39).

### b.  Discussion

The defendant now argues that the Court should have given him credit at sentencing for the time that he had already spent in custody on the 2010 Robbery Sentence, because it was relevant conduct that was part of the investigation in the instant case.  But as noted by the Government at the defendant's sentencing in the instant case, without any objection from the defendant, the 2010 Robbery was not relevant conduct.  The 2010 Robbery Conviction and the instant case involved different robberies, committed at different times, with different coconspirators.  The 2010 Robbery Conviction is therefore not relevant conduct, as the Court knew and took into account when imposing its sentence, which it deliberately chose to run consecutively to the 2010 Robbery Sentence.  *See* U.S.S.G. § 5G1.3(d) (policy statement noting that if the defendant is serving an undischarged term of imprisonment for conduct that was not relevant conduct, the Court may impose the new sentence on the instant offense "to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense").

The defendant also argues that he should have received credit for the time that he had spent in custody on the 2010 Robbery Sentence in the instant case, pursuant to 18 U.S.C. § 3585(b).  But this argument should be addressed to the BOP, not the district court, as it is the

BOP that calculates whether any time should be credited under Section 3585(b).  *See United States v. Wilson*, 503 U.S. 329, 334 (1992).  Further, the defendant is not eligible for credit under Section 3585(b).  Section 3585(b) states that a defendant shall be given credit for time spent in official detention before his sentencing if that time "has not been credited against another sentence."  18 U.S.C. § 3585(b).  The time that the defendant spent in custody between 2014 and his sentencing in the instant case was credited against the 2010 Robbery Sentence.  The Court was clear that the sentence in the instant case should run consecutively to the 2010 Robbery Sentence.   Section 3585(b) therefore is not applicable here.

### Conclusion

The Government respectfully requests that the Court (i) hold that the defendant's arguments regarding credit for time served have no merit; and (ii) vacate and re-enter the judgment of conviction, so that the defendant may file an appeal, if he still desires to do so.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:  */s/ Margaret Graham*
Christopher J. DiMase
Margaret Graham
Jessica Feinstein
Assistant United States Attorney
Southern District of New York
(212) 637-2433/ -2923/ -1946

cc:   Bobbi Sternheim and Grainne O'Neill, Esqs. (by ECF)
Oneil Scott, Register # 66195-019 (by United States mail)

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA

                                        16 Cr. 29 (VSB)
                                        19 Cv. 3322 (VSB)

       -against-

                                          DECLARATION

O'NEILL SCOTT,

                    Defendant.
-------------------------------------------------------x


      BOBBI C. STERNHEIM, pursuant to 28 U.S.C. § 1746, declares the following under

penalty of perjury:

      1.  I am an attorney admitted to practice before this Court and counsel appointed

to represent O'Neill Scott pursuant to the Criminal Justice Act.

      2.  I submit this declaration pursuant to court order in response to claims alleged by Mr.

Scott in his motion pursuant to 28 U.S.C. § 2255.

      3.  In alleging ineffective assistance of counsel, Mr. Scott states that counsel failed to file

a notice of appeal, that the robbery he committed in 2010 is relevant conduct to the robberies he

committed in 2014, and that he is entitled to credit for the time served during detention on the

present case while serving a federal sentence imposed in 2014.

      4.  In 2014, the Honorable P. Kevin Castel sentenced Mr. Scott to a term of imprisonment

of 63 months following his guilty plea to a 2010 Hobbs Act robbery conspiracy charged in

Indictment 14 Cr. 260 (PKC).

5. Two years later, Indictment 16 Cr. 29 (VSB) charged Mr. Scott and two co-defendants with offenses that occurred in 2014: conspiracy to commit Hobbs Act robbery, attempted Hobbs Act robbery, conspiracy to commit kidnapping, and use of a firearm in furtherance of a crime of violence.

6. After review of Rule 16 discovery revealed no connection between the 2010 robbery and the 2014 robbery conspiracy, defense counsel conferred with the government to determine whether the 2010 robbery constituted conduct relevant to the 2014 robbery. The government confirmed that the 2010 robbery was not related to the 2014 offenses.

7. Counsel informed Mr. Scott that the issue regarding relevant conduct was investigated, that counsel could find no evidence of relationship between the 2010 robbery and the 2014 offenses, and that the government confirmed, based on its evidence, that the prior robbery did not constitute relevant conduct.

8. Possessed with this information, Mr. Scott entered a guilty plea pursuant to a plea agreement that contained an appeal waiver:

> It is agreed (i) that the defendant will not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241 ; nor seek a sentence modification pursuant to Title 18, United States Code, Section 3582(c), *of any sentence at or below the Stipulated Guidelines Sentence of life imprisonment*, and (ii) that the Government will not appeal any sentence at or above the Stipulated Guide lines Sentence. (Plea agreement, page 7; emphasis added.)

9. On February 25, 2019, this Court sentenced Mr. Scott to a total term of 300 months "consecutive to the undischarged term of imprisonment that Mr. Scott is currently serving." (Sentencing Transcript, page 39.)

10.  During sentencing, the government confirmed that the 2010 robbery was not relevant conduct:

> It's the government's position that the 2010 robbery to which Mr. Scott pled guilty and was ultimately sentenced by Judge Castel in 2014 - - is not relevant conduct, right and there are three criminal history points assessed in the PSR.  And we also submit that the policy statement 5G1.2 discussing the consequence of certain prior conduct being relevant conduct for sentencing purposes would not apply because we don't view it as relevant conduct, and I would just note it's far outside the window of the charged conspiracy, 2010 versus 2013, '14; and also, based on the government's investigation, it involved different sets of actors, different people involved in the 2010 robbery than were involved in the 2013 and '14 robbery conspiracy that's charges in this indictment. (Sentencing Transcript,  pages 29-30.).

11. Mr. Scott mischaracterizes the present indictment as a "superseding indictment."  It is a separate indictment alleging crimes committed in 2014 that are unrelated in time and scope to the 2010 robbery charged in the 2014 indictment

12.  Relying on 18 U.S.C. § 3585(b) and asserting that the 2010 robbery is relevant conduct, Mr. Scott is seeking credit for time served in detention on the present case while serving his federal sentence for the prior, unrelated case.

13.  By writ, Mr. Scott was transferred from federal prison ,where he was serving his 2014 sentence, to the Metropolitan Detention Center (MDC), where he was detained during the pendency of the instant case.  Upon information and belief, the time spent in the MDC was credited to Mr. Scott's 2014 sentence.

14.  Mr. Scott contends that pursuant to § 3585(b) he should also receive credit toward his 2019 sentence.

15.  Section 3585(b) does not permit double credit: "A defendant shall be given credit toward [his] term of imprisonment for any time he has spent is official detention prior to the date the sentence commences" if such time "*has not been credited against another sentence.*" (Emphasis added.)

16.  In or about March 26, 2019, some four weeks after sentence was imposed, Mr. Scott send a Corrlinks email to co-counsel Grainne E. O'Neill, Esq.:

> *i do not wish to appeal the sentence* what *I want to appeal is the decision that the Judge made about my time that I have served that I am entitle [sic] to. I am only asking that we make a motion on that issue,* so the sentence is not my worry. I have accepted responsibility already and was willing to face my punishment. Let me know if we can put in the argument for my time credit from January 22, 2016 until my sentence date of 2019 … thank you!!! (Emphasis added.)

17.  Mr. Scott voluntarily entered a guilty plea with the knowledge and understanding that he faced a possible life sentence and could not appeal that stipulated guideline sentence. The government sought a life sentence. The Court imposed a sentence of 300 months (25 years).

18.  Under the terms of his plea agreement, Mr. Scott waived the right to appeal his sentence.

19.  Mr. Scott is not eligible for relief pursuant to § 3585(b).

20.  Further, as the Supreme Court has held, it is the Attorney General, not the District Court, who computes the amount of  § 3585(b) credit after the defendant has begun to serve his sentence. *United States v. Wilson*, 503 U.S. 329, 331-337 (1992).

21.  If Mr. Scott persists in his belief that he is entitled to credit pursuant to § 3585(b), he may petition the Attorney General for relief.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on November 12, 2019

/s/ Bobbi C. Sternheim

_____

BOBBI C. STERNHEIM, ESQ.

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA

                                  16 Cr. 29 (VSB

    -against-                         19 Cv. 3322 (VSB)

O'NEILL SCOTT,

                  Defendant.          SUPPLEMENTAL DECLARATION

-------------------------------------------------------x

       BOBBI C. STERNHEIM, pursuant to 28 U.S.C. § 1746, declares the following under penalty of perjury:

       1.  I am an attorney admitted to practice before this Court and counsel appointed to represent Oneill Scott pursuant to the Criminal Justice Act.

       2.  I make this supplemental declaration in response to the claim of ineffective assistance of counsel alleged by Mr. Scott in his motion pursuant to 28 U.S.C. § 2255.

       3.  On February 25, 2019, the Court imposed sentence for Mr. Scott; the judgment was filed on March 15, 2019.

       4.  Mr. Scott's first mention to counsel of a notice of appeal was made in a Corrlinks email to co-counsel Grainne E. O'Neill, Esq., received on or about March 25, 2019, one month after sentence was imposed:

> hey ms. grainne
> i am currently writing you *to ask you if you was aware of filing a notice of appeal within the time frame applied by the court ?* the reason why i ask is because i have reasons to believe that i can ask the courts to at least reimburse me with some of my time credit that i have served due to this situation. i am not asking for the full amount, i am only asking for the time i have been here in mdc, which is 3 years and some change. *i think with the proper argument the court may impose the concurrent sentence.* let me know as soon as possible...thanking you in advance for your time and consideration!!!

(Original text) (emphasis added).

5.    In a Corrlinks email to co-counsel Grainne E. O'Neill, Esq., received on or about

March 28, 2019, Mr. Scott stated:

> *i do not wish to appeal the sentence what I want to appeal is the decision that the Judge made about my time that I have served that I am entitle [sic] to. I am only asking that we make a motion on that issue, so the sentence is not my worry.* I have accepted responsibility already and was willing to face my punishment. Let me know if we can put in the argument for my time credit from January 22, 2016 until my sentence date of 2019 … thank you!!!

(Original text) (emphasis added).

6.   In a Corrlinks email sent to Mr. Scott on or about March 28, 2018, Ms.

O'Neill stated:

> Hi yes and I forwarded everything to Bobbi but I don't really know what to do because you can't appeal the judge's order to run the sentences consecutive without appealing the sentence.  Bobbi is going to take care of it but we are also outside the 15 day window to appeal.  I'm sorry.

7.   In a Corrlinks email to Ms. O'Neill, dated March 28, 2019, Mr. Scott stated:

> i understand that bobbi is going to take care of the situation but what im concerned about is getting my 3 years which i think is a good *argument to put in front of the judge* due to same relevant conduct which the law requires. *i also understand that you and bobbi as my attorneys where suppose to put in a notice of appeal (NOI) regardless if i wanted to appeal my sentence or not. that is your job, to notify the courts of my appeal rights in the future. anything can happen within 25 years that may benefit me.*

(Original text) (emphasis added).

8.   I recall reviewing my notes to confirm that the issue of credit for time

served for this case while in the MDC was raised by counsel and addressed by the

Court during the sentencing proceeding.

9.    Mr. Scott's emails - sent 30 days after sentencing and 10 to 13 days after the filing of the judgment – were neither directives nor demands to file a notice of appeal.  They were requests to ask the sentencing judge, not the Circuit, to give him credit for time served in the MDC for the present case while serving his prior, unrelated federal sentence, a request previously made during the sentencing proceeding.

10. Mr. Scott incorrectly suggests that counsel is "suppose[d] to put in a notice of appeal," regardless of whether he wishes to appeal his sentence, as a placeholder should he be entitled to relief during the pendency of his sentence.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on February 19, 2020

_____/s/_____

BOBBI C. STERNHEIM, ESQ.

# EXHIBIT C

J2p1scos

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                          16 Cr. 29 (VSB)

ONEIL SCOTT,

           Defendant.              Sentencing

------------------------------x

                            New York, N.Y.
                            February 25, 2019
                            11:08 a.m.


Before:

                HON. VERNON S. BRODERICK,

                            District Judge


                      APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
BY:  CHRISTOPHER J. DiMASE
    MARGARET S. GRAHAM
    Assistant United States Attorneys

LAW OFFICES OF BOBBI C. STERNHEIM
    Attorneys for Defendant
BY:  BOBBI C. STERNHEIM, ESQ.   GRAINNE O'NEILL, ESQ.

O'NEILL/HASSEN
    Attorneys for Defendant
BY:  GRÁINNE O'NEILL, ESQ.

J2p1scos

```
 1              (Case called)
 2              THE DEPUTY CLERK:  Will counsel please state their
 3      appearances for the record.
 4              MR. DiMASE:  Good morning, your Honor.  Christopher
 5      DiMase and Margaret Graham for the government.
 6              THE COURT:  Okay.  Good morning.
 7              MS. STERNHEIM:  Good morning, Judge.  Bobbi C.
 8      Sternheim and Gráinne O'Neill for Mr. Scott, who is present at
 9      counsel table.
10              MS. O'NEILL:  Good morning.
11              THE COURT:  Okay.  Good morning.
12              And good morning, Mr. Scott.
13              You may be seated.
14              So this is a continuation of a sentencing which I
15      think we began on November 15th.
16              Now, Mr. Scott, if at any point in time you don't
17      understand something I'm saying or you'd like additional time
18      to speak to your attorneys, just let me know and I'll stop the
19      proceedings and I'll allow you to do that, okay?
20              THE DEFENDANT:  Yes, your Honor.
21              THE COURT:  All right.  Now in connection with today's
22      proceeding, let me review for the parties the materials that
23      I've received.  I've received the presentence report, which is
24      dated February 23rd of 2017, and was revised on March 23rd of
25      2017; I have the defendant's sentencing submission which is
```

J2p1scos

1    dated November 1st, which includes various letters including

2    from Mr. Scott, from friends, family members, the mothers of

3    his children, from Elaine Robinson, who helped raise Mr. Scott,

4    a friend of the defendant's mother -- I'm sorry -- who helped

5    raise you, and your sister, as well as various certifications

6    from the Bureau of Prisons, work performance ratings, and I

7    note that some of the letters I think were letters that had

8    been also submitted in connection with the earlier case before

9    Judge Castel.  I have the government's sentencing letter dated

10   November 7th of 2018.  I've also reviewed the sentencing

11   transcript from the earlier sentencing before Judge Castel, the

12   sentencing submission submitted in that case, as well as the

13   government's letter from that case.  As I mentioned the last

14   time, since those materials had not been -- I had not indicated

15   to the parties in advance of our last appearance, I provided a

16   copy of those materials to the parties.

17           After I adjourned the sentence the last time, I issued

18   an order on November 23rd of 2018.  The government responded to

19   that order by letter dated February -- it says 2018, but I

20   think it was probably 2019.  I mean, it was 2019.

21           MR. DiMASE:  Yes, your Honor.  Apologies for that.

22           THE COURT:  No, that's fine.

23           And a defense letter addressing my order, which is

24   dated February 19th of 2019.

25           The defense also submitted a letter on February 20th

J2p1scos

1   of 2019, which attached a work performance rating from the BOP,

2   which I think is for a later period.  It looked like it was

3   from September 2017 to the present.

4           Are there any other submissions I should have in

5   connection with today's sentencing?

6           MR. DiMASE:  Your Honor, I only note this because it's

7   something the Court brought up at the last proceeding.

8   Attached to the government's letter of February 12, 2019 was

9   the one letter that the Court had requested.

10          THE COURT:  Yes.

11          MR. DiMASE:  So we did include that.

12          THE COURT:  All right.  So just to be clear, at the

13  last sentencing I had asked for I think a letter from a young

14  woman who had been Mr. Scott's fiancée, which I believe the

15  letter had been handed up to Judge Castel at the last

16  sentencing, and the government indicated it had a copy and did

17  attach a copy of that letter to its letter in response to my

18  order.  So I do have that.  I do have that document.

19          MR. DiMASE:  There is nothing else the government is

20  aware of.

21          THE COURT:  All right.  Ms. Sternheim.

22          MS. STERNHEIM:  Your Honor, there is nothing

23  additional.

24          THE COURT:  I should mention, however, although I

25  didn't have a copy, Ms. Sternheim, you referred to a

J2p1scos

psychological evaluation in your submission, and although I

don't have the actual report, I think you have summarized the

findings of Ms. -- I apologize --

        MS. STERNHEIM:  Carmeta Albarus.

        THE COURT:  -- Ms. Albarus in that.  So I should

mention that also.

        Ms. Sternheim, have you read the presentence report

and discussed it with Mr. Scott?

        MS. STERNHEIM:  Yes, both Ms. O'Neill and I have

reviewed it with Mr. Scott.

        THE COURT:  Okay.  Mr. Scott, have you read the

presentence report?

        THE DEFENDANT:  Sure, your Honor.

        THE COURT:  And have you discussed it with your

attorneys?

        THE DEFENDANT:  Sure, your Honor.

        THE COURT:  And have you had an opportunity to go over

with them any errors in the report or anything else that you

believe should be taken up with me?

        That's okay.  You can remain seated.  You just need to

speak into the microphone.  That's fine.

        THE DEFENDANT:  No, your Honor.  We already go through

it, sir.  Thank you.

        THE COURT:  I'm sorry.  You've already gone through

it?

J2p1scos

THE DEFENDANT:  Yeah, we already went through it and there's no mis -- error.

THE COURT:  Okay.  All right.  Thank you. Ms. Sternheim, do you have any objections to the presentence report?

MS. STERNHEIM:  No.

THE COURT:  Does the government have any objections?

MR. DiMASE:  No, your Honor.

THE COURT:  Okay.  So I'm going to adopt the factual findings in the report, and the presentence report is going to be made part of the record in this case.  It will be placed under seal.  However, counsel on appeal may have access to the report without further application to me or one of my colleagues.

Now, Mr. Scott, you may recall that when you pled guilty back in December of 2016 before me, I mentioned a set of rules called the Sentencing Guidelines.  Now those are rules that are designed to assist judges like myself when we impose sentence on individuals convicted of crimes.  Now the guidelines at one point in time had been mandatory, which would have meant I would have had to apply them in just about every case and could only depart or vary from them in very limited circumstances.  However, they're no longer binding.  However, I must consider them as part of my determination of what an appropriate sentence is for you.  So I'm still required, as I

7

J2p1scos

1  said, to consider the guidelines, but the guidelines really

2  just amount to a starting point for me.  So the first task that

3  I have to undertake is to calculate the guidelines and make

4  sure that I've done so accurately.

5        So Count One charges you with conspiring to commit

6  robbery.  In connection with that, you admitted to

7  participating in six robberies.

8        Count Two charges you with conspiracy to commit

9  kidnapping, and in connection with that charge, as a result of

10 the kidnapping conspiracy, there was in fact a kidnapping, and

11 you admitted at the time of your plea to attempting to obtain

12 information from Wayne Thomas through use of violence and that

13 Wayne Thomas died as a result of the efforts to obtain

14 information.  You and the co-conspirator, I should say.

15       Now since you pled guilty to the robbery conspiracy,

16 which involved six robberies, each robbery will be treated

17 separately.  So although the robberies can be grouped as part

18 of Count One, they can't be grouped with each other.  However,

19 Count Two can be grouped with the sixth robbery, since they

20 involve the same victim and common criminal objective or were

21 part of a common plan or scheme.  Therefore, there's going to

22 be a total of six groups that are used to determine your

23 offense level:

24       Group 1, which is basically Count One, robbery one,

25 the base offense level is 20.  There are five levels that are

J2p1scos

added to that because a firearm was possessed in connection

with that robbery.  One level is added because the taking of

the controlled substance was the object of the offense.  Since

you were considered an organizer, leader, or manager or

supervisor, two points are added to that.  And the adjusted

offense level becomes a 28.

Group 2, which consists of -- again, it's Count One

but the second robbery, again, the base offense level is 20.

Five levels are added to this because there was a firearm

possessed.  Two levels are added to that because the victim

sustained bodily injury in connection with that robbery.  The

victim was abducted to facilitate the offense, or the

commission of the offense, I should say, so four levels are

added to that.  One level is added because, again, the offense

involved the taking of a controlled substance or attempted

taking of a controlled substance.  You were also a manager,

supervisor in connection with this offense, so three levels are

added to that.  And the adjusted offense level becomes 35.

Now Group 3 is for the third robbery, also with regard

to Count One.  The base offense level again is 20.  Five levels

are added for use of a firearm.  One level is added because the

taking of a controlled substance was an object of the offense.

Since you're a manager or supervisor, three levels were added

to that.  And the adjusted offense level becomes a 29 for that

group.

J2p1scos

1          For Group 4, which, again, is the fourth robbery, the

2     base offense level is 20.  Two levels are added to that because

3     threat of death was made.  Since you were an organizer, leader

4     or manager or supervisor, two levels were added to that, which

5     results in an adjusted offense level of 24 for Group 4.

6          Group 5, which is the fifth robbery, again, related to

7     Count One, the base offense level is 20.  Five levels are added

8     because a firearm was possessed.  One level was added to that

9     because the taking of a controlled substance was an object of

10    the offense.  Since you were an organizer, leader, manager,

11    supervisor, two levels are added to that.  And your adjusted

12    offense level for Group 5 is 28.

13         Now Group 6, which is a combination of the sixth

14    robbery and Count Two, now the guidelines for a violation of

15    Section 1951 and Section 1201(c) both contain a cross-reference

16    that states that the victim was killed under circumstances that

17    would constitute murder under 18 United States Code

18    Section 1111; had such a killing taken place within the

19    territorial maritime jurisdiction of the United States, that

20    2A1.1 would apply.  Therefore, the base offense level for this

21    group is 43.  Since you're a manager or supervisor in

22    connection with this offense, three levels are added to that,

23    making the adjusted offense level 46.

24         Since all of the other groups are much less than Group

25    6 -- well, let me say it this way.  None of the groups except

J2p1scos

1    Group 6 get the unit, and that's because they're substantially

2    less in terms of their offense level, and therefore there's no

3    increase in the highest offense level, which is 46.   Three

4    levels are subtracted from that, for acceptance of

5    responsibility, and therefore, your offense level becomes a 43.

6            You have three criminal history points, which results

7    in a criminal history category of II.   And the resulting

8    guideline range is life.

9            The maximum fine is 25,000 to $250,000.

10           Do the parties agree that the Sentencing Guideline

11   range is life and that I've accurately calculated Mr. Scott's

12   guidelines?

13           MR. DiMASE:   Yes, your Honor.

14           THE COURT:   All right.   Ms. Sternheim?

15           MS. STERNHEIM:   Yes.

16           THE COURT:   All right.   Now with regard to whether or

17   not there are any departures that would be appropriate here, I

18   have considered whether there is a basis to depart from the

19   guidelines, and although I know I have the power to depart, I

20   find that there is no basis to depart under the circumstances

21   here.

22           Now I'll hear from the parties.

23           First, does the government wish to be heard with

24   regard to sentencing?

25           MR. DiMASE:   Judge, very briefly.

J2p1scos

1          THE COURT:  Yes.

2          MR. DiMASE:  I don't want to belabor points that we've

3     raised already.  There's been a lot of briefing here because of

4     the Court's questions in its order and the government's

5     original submission.

6          This is a defendant who has engaged in violent

7     criminal activity over a long period of time.  In the

8     government's view, something like this happening in the course

9     of these robberies was inevitable.  And when you routinely are

10    using loaded firearms to beat and threaten, brandish against

11    victims, when you are tying them up, restraining them in an

12    effort to get their property, eventually something like this is

13    bound to happen.  And it did.  And instead of -- not that there

14    was any right way to deal with it at that stage.  This was a

15    horrendous crime.  The victim was brutally kidnapped and beaten

16    and ultimately kidnapped and taken to a different location,

17    where he was beaten further.  Ultimately, when the victim was

18    killed, rather than addressing that situation, reporting it,

19    maybe that's too much to expect, but they did just the

20    opposite, and that effort was really led by Mr. Scott -- the

21    effort to kidnap this victim in the first place and the effort

22    to cover up the crime after the fact, which not only, as we

23    noted, desecrated Mr. Thomas's body in a horrendous way but

24    also put other lives at risk, still more lives at risk by

25    setting ablaze the victim's car in a crowded urban neighborhood

J2p1scos

where it could have easily caused the death of many more people

by setting structures on fire that were in that area.  It's

hard to imagine a more significant course of conduct being

capped by a more significant offense.  I think that this is the

kind of case that a life sentence was made for -- a person who

has demonstrated, through a course of violent conduct, that

they have no regard for other people's lives or the law and who

ultimately takes part in an incredibly violent offense, not an

offense where somebody is killed in a flash but beaten

mercilessly over hours and then strangled to death and then

left to burn in their own car.  I mean, these are just facts I

think that are difficult to reckon with, and for the family,

impossible to face I think for the rest of their lives.  And

those are the kind of facts that really truly do merit a life

sentence.

        Mr. Scott was given an opportunity here to plead

guilty to a nonmandatory life sentence, to give the Court the

ultimate decision about what the appropriate sentence is, but

we strongly believe that the guidelines sentence here of life

imprisonment is appropriate, and I think all of the additional

facts that we answered, all the additional questions we

answered point to that same outcome.  I don't think any of the

answers that the government provided to the Court's questions

really point in any other direction here.

        I do want one moment, if you wouldn't mind, your

J2p1scos

1    Honor.  I think we may have some of the victim's family members

2    in the courtroom.  I'm not sure about that.  I want to see one

3    way or the other.  And I want to see, if there are any such

4    victim family members, whether they have an interest in

5    addressing the Court.

6              THE COURT:  Okay.

7              MR. DiMASE:  One moment.

8              THE COURT:  Yes.

9              (Counsel conferring)

10             MR. DiMASE:  Your Honor, I haven't actually met the

11   victim's family.  I checked with defense counsel to figure out

12   who the folks are, and they're all members of Mr. Scott's

13   family, so my understanding is there are no victim's family

14   members here today.

15             THE COURT:  Okay.

16             MR. DiMASE:  If I could have just one moment.

17             THE COURT:  Sure.

18             And I take it in connection with the sentencing that

19   the government hasn't received, or the victim witness

20   coordinator at the U.S. Attorney's Office hasn't received

21   anything from the victim's family members.

22             MR. DiMASE:  Your Honor, that is my understanding.  I

23   do recall that earlier on in this case, we had been in touch

24   with the victim's family.  One problem was that the sentencing

25   was adjourned a number of times.

J2p1scos

1          THE COURT:  Yeah.

2          MR. DiMASE:  And I think that caused some friction

3    with the victim's family in terms of making plans to come and

4    then being told that the case had been adjourned.

5          I do recall that early on in the capital case process,

6    we did reach out to the victim's family about their views on

7    the death penalty, and my recollection is that they did not

8    think the death penalty would be appropriate, and that was a

9    consideration in terms of the ultimate decision in the capital

10   case context.

11         The only other thing I would mention is that we have

12   been in touch back and forth with the victim's family about

13   restitution for funeral and burial costs for Mr. Thomas, which,

14   as the Court is aware, is mandatory under the statute.  I

15   believe where things left off is we were still waiting for any

16   documentary evidence of the costs, and we had not gotten that

17   from the family.  So we would ask the Court to impose

18   restitution for the amount of those costs.  It is possible they

19   were covered by another victim rights organization and

20   therefore they wouldn't be entitled to it here, and we can let

21   the Court know by letter within the 90-day period after

22   sentencing whether or not there are any such costs and ask the

23   Court to impose that restitution formally if there are.

24         THE COURT:  Okay.  I think that makes sense that

25   within the 90-day period the government provides that

J2p1scos

information.  Obviously speak with Ms. Sternheim as you're

gathering that stuff, if you're going to provide me with a

restitution order at that point.

          MR. DiMASE:  Very good.

          I know the Court had a number of questions, as set

forth in the Court's order that we responded to by letter.  I'm

happy to answer any other questions the Court might have at

this point.

          THE COURT:  I think that the letter was very helpful,

and I appreciate both parties indulging my questions.  But let

me ask this.

          MR. DiMASE:  Yes, your Honor.

          THE COURT:  Because I think I know the answer to this

question.  Aren't there cases that involve intentional

murders -- and here, I mean, there may be some dispute about

that, but -- actual intentional murders where the government

offers and in fact are pled out for a term of years and not

life?  In other words, whether that's 20, 25, 30, whatever it

may be, for murders?

          MR. DiMASE:  Your Honor, I'm aware of cases where the

government has entered into an agreement where there was a, for

example, a 30-year mandatory minimum sentence, which was made

up of some combination of 924(c) firearms offenses and where

the guidelines sentence was that mandatory minimum sentence and

where the maximum sentence was life so that the judge could

J2p1scos

1    obviously impose the guidelines and mandatory minimum sentence

2    or could impose a sentence up to life; and that those sorts of

3    sentences are sometimes imposed in cases where there is an

4    allegation of intentional murder and not merely felony murder.

5          On the point of the dispute over the facts of this

6    particular case, there was obviously a significant beating that

7    happened of Mr. Thomas over the course of this event.

8          THE COURT:  Yes.

9          MR. DiMASE:  And there is some question, obviously,

10   based on the medical examiner's information, about what exactly

11   was the ultimate cause of death or whether it may have been a

12   combination of the beating that was inflicted on him and

13   asphyxiation from a chokehold.  Mr. Scott directly participated

14   in, based on the government's evidence, in the beating of

15   Mr. Thomas at the house in Brooklyn where he was kidnapped and

16   brought to.  And based on what we know so far from the medical

17   examiner, which may be all we ever know, because of the burn

18   injuries that were sustained, those appear to have been at

19   least partially the cause of the victim's death.

20         Was it intentional?  Was the goal to kill him?  I

21   think the witnesses would say the goal was to cause him to

22   provide information about the location of drugs and money, but

23   everybody knows when you kick somebody in the head repeatedly,

24   beat them with a gun, that death is a possible outcome of that

25   conduct.

J2p1scos

1          But, you know, just to pull out to a 30,000-foot view

2      on this, ultimately it's not just about this one incident.

3      This incident is horrific.  You know, the coverup is horrific

4      as well, and I think that is an important distinguishing factor

5      from maybe other cases where the murder is intentional but

6      there isn't a coverup that involves moving the victim's car,

7      putting the body in the car, burning the car, and putting other

8      lives at risk.

9          On top of that you have numerous other very violent

10     robberies, some of which involved the restraint of victims

11     which could have easily resulted in the same outcome, that are

12     part of this set of facts that the Court is dealing with.

13         And the strength of the evidence I think is an issue

14     as well.  I mean, I'm not privy to the facts of every case and

15     the strength of the evidence in every case where the government

16     has made a particular kind of offer.  Here, the government has

17     what it views as a very strong case, and it also had a count in

18     the indictment that carried a mandatory life sentence, so I

19     think that set of facts, the particulars about this murder and

20     the kidnapping and the coverup, the fact that Mr. Scott was

21     involved in so many other violent robberies and was, based on

22     the government's evidence, a leader of this crew that committed

23     numerous robberies, the fact that he faced a mandatory life

24     term otherwise in the indictment, and the fact that the

25     government had very strong proof of the defendant's involvement

J2p1scos

1    in these crimes, all, in our view, add up to an appropriate

2    sentence of life imprisonment in this case.

3         THE COURT:  Okay.  Let me ask, is it the government's

4    understanding that with regard to Mr. Scott, his current

5    situation, that he is not getting credit currently because of

6    the prior sentence, that he's not getting credit for the

7    instant offense?  In other words, that on sentencing, he'll

8    begin to get credit for this offense, assuming, whether it's

9    concurrent or consecutive, but that he is not getting credit

10   for it?

11        MR. DiMASE:  Well, I think your last point is really

12   what captures whether he gets credit or not.  Ultimately I

13   think it's a matter for the Court to decide whether some or all

14   of the sentence imposed on this instant case runs concurrent to

15   the other sentence.  Obviously I think the Court is going to

16   specify one way or the other, concurrent or consecutive.

17   You're asking retroactively.

18        THE COURT:  Correct.  In other words, yes.  And I

19   don't know the answer to this.  In other words, if what you're

20   saying is, if I say concurrent, that it will mean that he'll

21   get credit for all of the time, and I wasn't operating under

22   that assumption.  But I don't know.  I think I can be clear as

23   to what my intention is regarding any sentence, but I wasn't

24   sure as a legal matter what either would do.  I understand what

25   a consecutive would do.  It would mean that -- I think

J2p1scos

1    Mr. Scott was previously sentenced -- I want to say 70 months.

2    Am I correct about that?

3              THE DEFENDANT:  63 months.

4              THE COURT:  63 months?  -- 63 months before Judge

5    Castel.  So I understand exactly what a consecutive sentence

6    would be.  I mean, until he's completed the prior sentence, he

7    would still be -- well, let me ask:  Do you know?  Because it's

8    now -- it must be fairly close, I would guess.  He was

9    sentenced in 2015, but arrested in 2014.  Do you know whether

10   or not --

11             (Ms. Sternheim conferring with the defendant)

12             THE COURT:  I think Ms. Sternheim may know.

13             MS. STERNHEIM:  Mr. Scott believes that May 14th of

14   this year, coming year, 2019, would be the completion date.

15             THE COURT:  Okay.  That's helpful.  All right.

16             MR. DiMASE:  Your Honor, I think certainly the Court

17   has discretion regarding the remainder of the sentence, which

18   is obviously relatively small at this stage.  It's only a few

19   months.

20             THE COURT:  Right.

21             MR. DiMASE:  I don't know that we know the answer to

22   whether the Court could run the sentence concurrent beginning

23   the day that Mr. Scott was charged.  I'm not even clear what

24   the date would be.  There's the date of the charging and then

25   there's the date of the writ of Mr. Scott here to this district

J2p1scos

1    to be presented on the charge.

2            THE COURT:  And to be clear, just by your comment, I

3    wasn't -- in other words, all I was asking was what would be

4    the effect of me saying concurrent versus consecutive in this

5    context, not necessarily that -- because obviously the

6    ultimate, I think I understand.  And it's helpful to know when

7    the expiration date of the other sentence is.

8            MR. DiMASE:  At a minimum, the concurrent sentence

9    would include obviously the remaining sentence on the other

10   case, and the question is whether it would cover anything

11   before today, and I think you're right that the best the Court

12   can do is to express its view as to how it thinks a concurrent

13   sentence should work and let the BOP attempt to facilitate

14   that.

15           THE COURT:  Yes.

16           Okay.  Does the defense wish to be heard,

17   Ms. Sternheim?

18           MS. STERNHEIM:  Yes, Judge.  Thank you.

19           Your Honor, we certainly appreciate how complicated

20   this situation is, and we thank the Court for its attention to

21   it because it is somewhat difficult.  But there are a couple of

22   things that I'd like to say in addition to our briefing, which

23   really speaks to the life of Mr. Scott.

24           The government made certain statements about

25   Mr. Scott's view of the law, or how he responds to being a

J2p1scos

1    lawful citizen, and certainly the conduct he engaged in, there

2    is no excuse for it, but there is explanation.

3          But I would point out to the Court that when an

4    individual facing the kind of charges that Mr. Scott faces

5    decides to plead guilty in the face of -- which was not really

6    a plea bargain -- and your Honor has experience with the

7    office.  It's not that I could go in there and just say, this

8    is what I would like for Mr. Scott.  We got an offer.  It was a

9    tough offer, and Mr. Scott knew that he needed to accept

10   responsibility for his conduct, and he did.  There are many

11   cases that I have been in throughout the years, some with

12   Ms. O'Neill and some without, where we have faced very

13   difficult challenges, and frankly, we have gotten more

14   favorable dispositions even in cases where they were

15   intentional murders.  But I'm not here to really belabor what

16   the ultimate plea was, because he does accept responsibility.

17   But sentencing somebody who has pled guilty to life sends a

18   terrible message not only to the individual, who knows that

19   that is a possibility, but to the defense bar and the clients

20   that we represent as to why should we not go to trial in each

21   and every case if, by pleading guilty and accepting

22   responsibility, our clients are facing the very same outcome

23   where they don't accept responsibility, they put the government

24   to a difficult task, and they use up not only judicial

25   resources for counsel fees but also for a long-winded trial.

J2p1scos

1    And I just ask the Court to view this as sending a bad,

2    disparate situation where, in a very ugly felony murder case,

3    someone is treated as if he was an assassin who pled guilty.

4    And I have represented people in those kinds of cases.  Your

5    Honor has sentenced people in intentional murder cases.  And

6    there needs to be a reflection on the fact that he has pled

7    guilty.

8         There are tremendous enhancements here.  We appreciate

9    that.  But even if the Court were to take an average of all the

10   bump-ups and all the enhancements in this case, we're still

11   looking at over 31 years' imprisonment.  And that should be one

12   form of the analysis that I ask the Court to look at.  And

13   there are many cases where people have committed intentional

14   murder and have been sentenced to less than 30 years.

15        It is up to your Honor, obviously, to decide what is

16   appropriate here, but it is clear this was not an intentional

17   homicide.  It is a very bad crime that was committed, terrible

18   situation for the victim here, and one view of it is a

19   situation where people freaked out and acted inappropriately.

20   But that in and of itself does not warrant a life sentence in

21   this case.

22        THE COURT:  Just so I'm sure I understand, when you

23   say "acted inappropriately," you're talking about when they

24   realized that the victim had been killed --

25        MS. STERNHEIM:  Yes.

1          THE COURT:  -- there was disposal of the body after

2     that.

3          MS. STERNHEIM:  As you know, as the saying often goes,

4     the coverup becomes worse than what led to it, and I'm not

5     saying that that is worse, but it certainly was terrible, and

6     we don't excuse any of that.

7          But in sentencing a person, the judge, as you are,

8     balances the measure of the crime against the measure of the

9     man, and there is a lot that is very negative in Mr. Scott's

10    life, and not by his own choice.  I don't know if your Honor

11    stayed up very late last night to watch the Academy Awards,

12    but --

13         THE COURT:  I stayed up late, but not watching the

14    Academy Awards; I'll put it that way.

15         MS. STERNHEIM:  Okay.  And I only bring that to the

16    Court's attention because it was a very interesting and diverse

17    awards ceremony, and Regina King, who won supporting actress

18    for "If Beale Street Could Talk," gave a beautiful speech, and

19    in it she says:  I am the example of what it looks like when

20    support and love are poured into someone.  The exact opposite

21    is what we have here.  Very, very little love, if any --

22    certainly there may have been kindness -- was poured into the

23    life of Oneil Scott.  Very, very little support beyond

24    Mrs. Robinson letting him live with her, and his sister, and I

25    believe her daughter is here, and other family members who have

J2p1scos

1 provided some support for which we are grateful for Mr. Scott.

2 But he is an example of what happens to someone when love and

3 support are not poured into a little boy, a teenager, a man.

4 We do not excuse any of his conduct, but I can say to you, and

5 Ms. O'Neill as well, these years that we have spent with

6 Mr. Scott have been quite extraordinary.  We have had the

7 opportunity to, I hope, provide some of that affection and

8 support into this individual, and we have seen what he is

9 capable of in the most positive ways, how articulate he is, how

10 kind he is.  To be in the MDC, which is a whole other issue

11 these days, and to have correction officer after correction

12 officer speak so positively of Mr. Scott, not only warms the

13 heart but also says how different this man is, not only in an

14 institutional environment but certainly in contrast to the very

15 terrible crimes that he committed and for which he has accepted

16 responsibility.

17   We are not asking this Court to sentence lightly, but

18 there is a sentence that is sufficient but not greater than

19 necessary, and a life sentence is far more greater than

20 necessary to mete out the purposes of sentencing.  And we ask

21 your Honor to give him a sentence which will at one point in

22 his life let him get out, even if he is an older gentleman, to

23 be reunited with his children and his family.

24   And I will ask Ms. O'Neill if she wishes to say

25 anything, and I know that Mr. Scott has been waiting for the

J2p1scos

opportunity to address the Court.

        THE COURT:  Okay.

        MS. STERNHEIM:  And I am available for any questions, of course.

        THE COURT:  Thank you, Ms. Sternheim.

        Ms. O'Neill.

        MS. O'NEILL:  I'll be very brief because I don't want to repeat what Ms. Sternheim has said, but I was brought onto this case to assist Ms. Sternheim in representing Mr. Scott when it was still a pending death penalty case, and as I'm sure your Honor is aware, when that is the status of the case, it is very difficult for the defendant and family and loved ones to appreciate that that's possible, that it exists in New York, and that it's a very real possibility.  And over the years that I've had the opportunity to visit with Mr. Scott in prison, I have seen a remarkable transformation.  His smile, which you'll probably not have occasion to see today, lights up a room whenever I walk in.  And I've seen him visiting with family in the MDC and I've seen them talking and just engaged in a loving and kind conversation in a way that is unusual in MDC.  Many people are filled with anger.  Many people take that out on their attorneys.  Mr. Scott never did that.  And I think that part of that is probably his upbringing.  He was born and raised to not expect anything from anyone, to never expect a moment of kindness, to never hope that someone would love him,

J2p1scos

and what's unusual about him is that he came to this country, and he sought out his family.  He sought them out and he reunited with them, and he became an important member of his family and community.

And we can see that also in his children, in his relationship with their mothers, which is unusual.  Often when people break up, there's a lot of animosity, and we don't have that here.  We have him being kind and trying to provide for his children.

And I think that what I saw in his life when Ms. Nelson died was horrifying.  He was alone, he was in jail, he couldn't get ahold of her, and as it turned out, she had hung herself and was in her apartment for days.  And I know that he bears the scars of that emotional situation and that he feels responsible for her death.

We know that the crime is horrible.  We know that Mr. Scott should never have been participating in robberies or kidnappings or trying to get money from drug dealers.  That's not at all what he should have been doing, and he knows that, and his family knows that.  But what we do ask is that the Court acknowledges the hardship that he suffered and can balance that against the harms that he has committed.

Thank you.

THE COURT:  All right.  Thank you.

Before I hear from Mr. Scott, I have a question for

J2p1scos

1    the government, and it just popped into my head.  With regard

2    to Mr. Thomas, was Mr. Thomas actually involved in the drug

3    trade?

4              MR. DiMASE:  Yes, your Honor.

5              THE COURT:  Okay.

6              MR. DiMASE:  Actually, two things on that point.  When

7    you say involved in the drug trade, I think Mr. Thomas was

8    involved in robbing drug dealers just like Mr. Scott, and we

9    believe he obtained the drugs and essentially money that

10   Mr. Scott and his co-conspirators sought to steal, or rob from

11   him, in a separate robbery.  Also, Mr. Thomas was friends with

12   Mr. Scott and other folks that were part of this robbery crew,

13   and they had actually committed robberies together in the past,

14   until he became the victim of this particular kidnapping and

15   robbery.

16             THE COURT:  Okay.  Thank you.

17             Mr. Scott, do you wish to be heard?  You can remain

18   seated.  Just pull the microphone -- that's good.

19             THE DEFENDANT:  Good day, your Honor.  I want to

20   apologize to you in advance if I become emotional.

21             Even though admitting to my bad action is the right

22   thing for me to do, it is painful to lay out all that I have

23   done.

24             When I had come into these robberies, I was not

25   thinking about the consequences to the victims, their families,

J2p1scos

1    the court, my family, and the community.  I did not think about

2    repercussions for my children.  I did not think at all.  I

3    wanted to believe that I was loyal and determined to provide

4    for my kids and protect those I love, but I did not do that.  I

5    am so humble that my family continues to support me.  Although

6    they have expressed support and love throughout all this, I am

7    clearly broken and failing them.  This is what I deserve for my

8    bad actions.

9         I'm sorry.  I am embarrassed, and I wish I had not

10   taken up the Court's time.  I apologize to the officers, the

11   court staff, and to you, your Honor.  I am ashamed.  And even I

12   ask for forgiveness from the victim's family, but I am so sorry

13   to everyone in my community too, because I understand that

14   violence bring violence.

15        Since I have been in prison, I have realized how many

16   people I have made suffer.  There is no excuse for my crimes.

17   I deeply regret what I have done.  I have tried to atone by

18   participating in programs and learning how I can be the man I

19   wish I was all along.  I know that change cannot be quick, and

20   it is hard, but I will not give up, because I want to become a

21   proper role model for my children in their lives.  They are now

22   6 and 8 years old.  While it may be impossible for others to

23   see the changes that I have made on my life, I know I am a

24   better man today than I was a few years ago.  I can see who I

25   was, who I am, and who I want to be.  Now I can see the things

J2p1scos

1    that I was too blind to see while I was free.  I deserve

2    punishment, and I ask to please give me an opportunity at some

3    point to be of help to those I love.  I will not disappoint you

4    or society again.

5            I am very much aware of the time that my crimes carry.

6    I hope that my sentence will allow me to rebuild myself and not

7    leave prison a waste man, depending on the charity of my

8    family.  No day goes by where I do not think about the hearts I

9    have broken or the people my actions have devastated,

10   especially the victim and his family.  I take my incarceration

11   as an opportunity to turn a new chapter in my life.

12           I wish to say I love all my family and friends that

13   are here today to stand with me as I continue to become a

14   better man today.  Thank you so much, your Honor.

15           THE COURT:  Okay.  Thank you, Mr. Scott.

16           Is there any reason why sentence should not be imposed

17   at this time?  From the government?

18           MR. DiMASE:  No, your Honor.  We have just one more

19   point to raise.

20           THE COURT:  Yes.

21           MR. DiMASE:  And I'm not sure whether the Court

22   considered it or not.  It's the government's position that the

23   2010 robbery to which Mr. Scott pled guilty and was ultimately

24   sentenced by Judge Castel in 2014 --

25           THE COURT:  Was not relevant.

J2p1scos

1          MR. DiMASE:  -- is not relevant conduct, right, and

2     there are three criminal history points assessed in the PSR.

3     And we also submit that the policy statement 5G1.3 discussing

4     the consequence of certain prior conduct being relevant conduct

5     for sentencing purposes would not apply because we don't view

6     it as relevant conduct, and I would just note it's far outside

7     of the window of the charged conspiracy, 2010 versus 2013, '14;

8     and also, based on the government's investigation, it involved

9     different sets of actors, different people involved in the 2010

10    robbery than were involved in the 2013 and '14 robbery

11    conspiracy that's charged in this indictment.

12          THE COURT:  Okay.

13          MR. DiMASE:  In any event, with that in mind, no,

14    there is no reason why sentence cannot be imposed.

15          THE COURT:  Ms. Sternheim, is there any reason why

16    sentence should not be imposed at this time?

17          MS. STERNHEIM:  No, your Honor.

18          THE COURT:  As I've stated, the guidelines here, the

19    guideline range results in life.  Now under the Supreme Court's

20    decision in *Booker* and its progeny, the guidelines, as I

21    mentioned earlier, are just one factor that I must consider in

22    determining an appropriate sentence here.  I'm also required to

23    consider the factors set forth in 18 U.S.C. Section 3553(a),

24    and I have done so.  The factors include, but are not limited

25    to, the nature and circumstances of the offense and the

J2p1scos

1    personal history and characteristics of Mr. Scott, since each

2    defendant must be considered as an individual.  Judges are also

3    required to consider the need for the sentence imposed to

4    reflect the seriousness of the offense, promote respect for the

5    law, provide just punishment for the offense, afford adequate

6    deterrence to criminal conduct, and avoid unwarranted

7    sentencing disparities, among other things.

8            Now I note that the probation department here has also

9    recommended a sentence of life.  And the government recommends

10   a sentence of life.  Ms. Sternheim, you've requested that I

11   grant a substantial variance and impose a sentence of 20 years'

12   imprisonment, taking into account Mr. Scott's characteristics,

13   as well as the fact that he's been in prison since August of

14   2014.

15           So first I'll discuss the circumstances of the

16   offense.  I think all parties have agreed here that this is an

17   incredibly serious offense, or offenses, I should say.

18   Participating in a conspiracy to commit robbery, admission to

19   six robberies in connection with that conspiracy, each of those

20   robberies involved one or more of the following: the use of

21   firearms; kidnapping; some level of violence or threat of

22   violence; and threat of death; and obviously the robbery of

23   Mr. Thomas resulted in his death.  So in essence, you

24   participated in intimidating and terrorizing victims of the

25   robberies in order to obtain money and drugs, and in one

1   instance, a victim was injured; in the other, as I mentioned,

2   Mr. Thomas was beaten and killed.  I think it's incredibly

3   serious conduct and conduct that is in many ways difficult to

4   comprehend.  And in addition, I do also note that although not

5   intentional, in committing these crimes, there was a

6   likelihood, and perhaps a substantial likelihood, that

7   something like occurred to Mr. Thomas might occur.

8           Now the defense, in your submission, it indicates that

9   your life has been filled with violence and the struggle to

10  survive and that you justified your participation in the

11  robberies as acceptable in a world governed by the rule of

12  survival of the fittest, wherein you did not see drug dealers

13  as real victims.  And I don't doubt that that may have been

14  your viewpoint at the time.  However, I hope that you recognize

15  that that's a flawed viewpoint, and it's flawed for several

16  reasons.  First -- and I accept the premise and I accept the

17  arguments that have been made that your life has been filled

18  with violence and a struggle to survive that I probably can't

19  really comprehend.  And it's clear to me that your upbringing,

20  it's to your credit, but also something that I think merits

21  consideration, because it's clear that even with that violence

22  and your struggle to survive, you clearly, based upon the

23  letters I've read, are someone who people view as a good friend

24  and father, and many of the letters that have been written on

25  your behalf indicate that.  So I guess what I would say is that

J2p1scos

obviously is a positive, and I'll talk about that in a moment
when I talk about your personal characteristics.

        But what it also points out is that the criminal
activity and the violence were targeted and strategic, rather
than being a general part of your life.  In other words, you
did not -- or at least there's nothing in the record to suggest
that the acts of violence were perpetrated against any of your
friends or family members.

        And that leads to the second point, which is the fact
that just because someone may be a drug dealer does not make
them any less a victim.  Obviously they do assume the risk to a
certain extent if they're involved in that trade, but that
doesn't mean they've consented in any way to being robbed or
kidnapped or beaten or pistol whipped and killed.  And I think
perhaps, if you look at it this way, as the government
indicated, Mr. Thomas was in a similar sort of trade as
yourself.  As they say, there but for the grace of god go I,
right?  It could have been you, right, on that end?  And I
don't know Mr. Thomas's specific situation in terms of his
family, but I imagine he has folks who care for him, may have
had kids, and the like, and so that's the other aspect of it,
and that's why it's sort of a flawed sort of logic, because in
many ways, you know, Mr. Thomas was much like yourself.

        And finally, I do understand that someone who is
raised in the conditions that you were raised in -- and I'll

J2p1scos

get to the specifics of that in a moment -- that it's an

unbelievably difficult environment to escape from and not to

get wrapped up in that cycle of violence and the like.

However, there are folks who don't succumb to that.  There's no

question that they have difficulty in their lives, but they

don't resort to that violence to survive, and to get by.

So first, the government had mentioned there were five

additional robberies in their recent letter that were just

based upon I think co-conspirator statements, largely.  As the

government concedes, the robberies were largely based on a

single cooperator.  Since you were not charged with those

robberies and the government hasn't sought to prove those

robberies in connection with a *Fatico* hearing, I'm not going to

consider any of those in connection with your sentencing.

I'm also not going to hold you responsible for the

marijuana and guns that were seized at the time of your arrest

in a Atlanta, although there's no question that there were guns

and marijuana found in that home.  There is substantial

question about whose guns and drugs those were.  And in fact,

as I understand it, some of the other folks who were in the

house pled guilty to those, to possessing the guns and the

drugs, so I'm not going to consider that as part of your

sentencing.

But now let me discuss your personal history and

characteristics.

J2p1scos

1          Now according to the presentence report and your

2     submission, there's no question you were raised in extremely

3     poor economic conditions in Jamaica.  You became an orphan at

4     an early point in your life, I think around when you were 6

5     years old.  Your father and mother died early in your life, so

6     you really did not have the contact with them growing up.  A

7     friend of your mother's, Ms. Robinson, took you in and your

8     sister in and it appears raised you as her own and helped as

9     much as she could, based upon the meager existence that she was

10    able to eke out at the time.  Ms. Robinson wrote letters on

11    your behalf, I think in connection with the prior sentencing.

12    I've read those letters.  It's clear to me that she did care

13    for you and your sister, and in fact I believe, when she came

14    to the United States, continued to send food back to help care

15    for you.

16          Growing up, I understand that at times you didn't

17    actually know where your next meal would come from, and you had

18    to resort to stealing food in order to eat.  I understand that

19    you dropped out of high school in about the tenth grade because

20    of various issues going on with your life at the time.  And

21    there's no question that your childhood was -- well, I was

22    going to say a difficult childhood, but it might be fair to say

23    that you effectively didn't have what folks would view as a

24    normal childhood, perhaps.  So I'm going to consider your

25    upbringing as a child and your economic circumstances growing

J2p1scos

1    up in Jamaica in determining what an appropriate sentence is

2    here.

3        I've read, as I said, all of the letters that have

4    been submitted to me, and, you know, it's clear to me that your

5    friends and family members -- and you have family members here

6    today -- that view you as a good friend, a caring person, and a

7    loving and some say doting father on your children.  Many have

8    also commented that you're a hard worker, and they saw you

9    working as a barber and working as a party promoter.  And so

10   I'll consider their views of your character in connection with

11   making a determination of what an appropriate sentence is for

12   you, but as I alluded to earlier, the person they describe is

13   in stark contrast to the person that, you know, committed the

14   crimes that you have pled guilty to, and that's not easy to

15   reconcile.

16       And I note, in the face of the government's prior

17   sentencing submission that -- well, you may recall I adjourned

18   the sentencing in part because when I read the prior sentencing

19   submission and your comments at your earlier sentencing, I'll

20   be frank with you, it gave me pause, because of some of the

21   things you said there, and by that, I mean, you know, at the

22   time I think the prosecution mentioned some of the crimes, the

23   very crimes that we're talking about here today, and you said

24   in response to that, "Well, as I stand before your Honor, and I

25   deny the vicious comments that the government have been said

J2p1scos

about me in their sentencing letter, I've been in jail, locked

away from my children, almost certain to be deported as soon as

I serve your Honor's sentence.  I ask the Court please to have

mercy, please.  I'm not a violent person.  I'm not -- I'm a

simple god-fearing individual, sir, your Honor, without any

criminal record at all, other than this incident right here,

Judge Castel, occurring almost five years ago, which I deeply

regret."

          And the reason why it gave me pause is that that could

be viewed as not necessarily being truthful.  I think,

Ms. Sternheim, you referenced this, that there were other ways

that -- Mr. Scott, you didn't need to make statements about the

other conduct, and I wanted, quite frankly, the time.  And so

I'm going to chalk that up as, Judge Castel sentenced you with

regard to that and he took whatever you said into

consideration.  I'm not going to let that -- what could be

viewed as you lying to him to get a better sentence, I'm not

going to allow that to taint my view here.  And that's the

reason, quite frankly, because I'll tell you, I read that

earlier, that night, the night before the date we were here

before, and that morning, and I didn't feel that I was in the

appropriate state of mind to actually sentence you at that

time, because any time someone is in this courthouse or across

the street, I expect them to tell the truth, especially if

they're on the witness stand.  So I take that seriously, as do

J2p1scos

1   my colleagues, and I didn't want that to taint the sentencing

2   for you.  So I put it over until today.

3          So I'm not going to consider that.  I read it.  It is

4   what it is.  You were stating something and trying to -- well,

5   it is what it is.  I'll just leave it at that.

6          I am going to consider also the mental health

7   assessment that was done by Carmeta Albarus, something, as I

8   mentioned earlier, that was part of the evaluation in the

9   November 1st letter submitted on your behalf.

10         And I'm now prepared to impose sentence.

11         Mr. Scott, if you could please rise for the imposition

12  of sentence.

13         It is the judgment of the Court that you be committed

14  to the custody of the Bureau of Prisons for a period of 240

15  months.  That term is to be -- you may be seated.  So 240

16  months, as I calculate it, is 25 years.  That term is going to

17  run consecutively to your current sentence.

18         MR. DiMASE:  Your Honor, I think that's 20 years.

19         THE COURT:  Oh, I'm sorry.  300 months.  You're right.

20  300 months.  I apologize.  300 months, which is 25 years.

21         That term will be run consecutively to the term of

22  imprisonment you're currently serving.  That term of

23  imprisonment consists of 20 years on Count One and 30 years on

24  Count Two, to run concurrently with one another.

25         I'll also impose three years of supervised release.

J2p1scos

1          I believe that this sentence is sufficient but not

2     greater than necessary to comply with the purposes of

3     sentencing set forth in 18 United States Code Section 3553(a).

4     There will be no fine because the probation department does not

5     recommend a fine because of your limited financial situation.

6     However, you must pay a mandatory special assessment of $100 on

7     each count, for a total of $200.

8          With regard to the terms of your supervised release,

9     the standard conditions will apply, as well as the special

10     conditions listed on pages 27 and 28 of your presentence

11     report, and the mandatory conditions on page 27.

12          Does either counsel know of any legal reason that the

13     sentence should not be imposed as stated?

14          MR. DiMASE:  One moment, your Honor.

15          THE COURT:  Yes.

16          (Counsel conferring)

17          THE COURT:  I'm sorry.  I'm sorry.  I misspoke.  It

18     should be 20 years on Count One, 25 years on Count Two.  I

19     apologize.

20          MR. DiMASE:  Concurrent to one another.

21          THE COURT:  Concurrent to one another, correct, but

22     consecutive to the undischarged term of imprisonment that

23     Mr. Scott is currently serving.

24          I'm sorry, Mr. Scott.  I misspoke.

25          MR. DiMASE:  Thank you, your Honor.  That clarified

J2p1scos

1    one issue.

2           Regarding the term of supervised release, does the

3    Court intend to impose that?  I don't know if you mentioned

4    supervised release.

5           THE COURT:  I did.  Three years of supervised release.

6           MR. DiMASE:  Okay.

7           THE COURT:  With the special conditions on pages --

8           MR. DiMASE:  I'm sorry.  You did say that, your Honor.

9           No, I have no objections to that.

10          THE COURT:  All right.  Ms. Sternheim?

11          MS. STERNHEIM:  No.  Thank you.

12          THE COURT:  All right.  So that's the sentence that is

13   going to be imposed.

14          And Mr. Scott, obviously it's a long sentence.  It's

15   longer than what your attorneys had requested, and no doubt

16   longer than what you expected.  I didn't view, and I typically

17   don't view -- I didn't view it, obviously, as warranting that

18   you spend the rest of your life in prison.  I'm hoping that

19   when you get out and you'll be -- you won't be old, I'm not

20   going to say you'll be old, because you'll probably be as old

21   as I am now and I don't view myself as old, but I hope that you

22   use your time in prison to benefit yourself, both in terms of

23   both mentally and your education but also in terms of coming to

24   terms with yourself and also with your family.  Look, they're

25   here supporting you.  You have kids who, although it will be

J2p1scos

 1  difficult, I encourage you to try and be a part of their lives

 2  as they're growing up.

 3          All right.  So you have the right to appeal your

 4  conviction and sentence to the extent it's consistent with the

 5  plea agreement here.  The notice of appeal must be filed within

 6  14 days of the judgment of conviction.  If you're not able to

 7  pay the cost of an appeal, you may apply for leave to appeal *in*

 8  *forma pauperis*.  If you request, the clerk of the court will

 9  prepare and file a notice of appeal on your behalf.

10          Now I'm going to dismiss the underlying indictments

11  and any open counts in this case.

12          Are there any other applications?  From the

13  government?

14          MR. DiMASE:  Your Honor, the government is not seeking

15  forfeiture, but as we indicated earlier in the proceeding, we

16  would ask the Court to indicate that it is going to include a

17  restitution obligation.  We will submit a letter to the Court

18  indicating what, if any, costs there are for the burial and

19  funeral of the victim.  If there are none, obviously there

20  won't be a restitution order.

21          THE COURT:  So I will impose restitution in the amount

22  with regard to the burial and funeral of Mr. Thomas, and the

23  government has 30 days within which to provide me with an order

24  to the extent that there are such costs, after consulting with

25  Ms. Sternheim.

J2p1scos

1              Ms. Sternheim.

2              MS. STERNHEIM:  Yes, your Honor.  I would ask the

3    Court to recommend a designation close to the metropolitan area

4    so that Mr. Scott can maintain contact with his children and

5    other family members.

6              THE COURT:  I will do that, and I'll recommend that

7    Mr. Scott be housed in the New York metropolitan area, or, at a

8    minimum, in the northeast.

9              Now, Mr. Scott, that's just a recommendation.  The

10   Bureau of Prisons will make the ultimate decision about that,

11   but that is what I'm going to recommend.

12             Anything else?

13             MS. STERNHEIM:  No.  Thank you.

14             THE COURT:  All right.  Thank you very much.  We'll

15   stand adjourned.

                              o0o

16

17

18

19

20

21

22

23

24

25